Please proceed, Counsel. Thank you. May it please the Court, Your Honor, Samantha Booth, pro bono counsel for the petitioner Juan Madrigal Navarro. I'd like to reserve four minutes for rebuttal, please. All right. Please watch your time. We're here today because my client, Mr. Madrigal, who's both deaf and mute, never received the full and fair hearing to which due process entitles him. It's plain from even the cold transcript that something, whether that was the freezing televideo system, the incompetent translation service provided, or a combination thereof, Mr. Madrigal was not able to communicate effectively with anyone in the courtroom, be that the immigration judge or his own counsel. If we look at the transcript, we see that it's littered with garbled and nonresponsive answers, including in response to questions that went to the very core of his case. We also see that on seven separate instances, Mr. Madrigal, the judge, and the interpreter each complained about the televideo system freezing, and contrary to what the government says, we also see repeated instances throughout the proceedings of Mr. Madrigal expressing difficulties understanding what was going on. In fact, it got so bad that 20 times in the 25 or so pages containing Mr. Madrigal's court testimony, the court reporter simply gave up trying to understand what he was saying and simply labeled the testimony indiscernible. We also have two instances in which the translator openly admitted that he had translated incorrectly. And, of course, we can't know how many other unacknowledged translation errors there were, but we can assume that there were quite a few from the ample – from the ample evidence we have here of communication difficulties throughout the entire proceedings. In other words, Your Honors, this is exactly the kind of record that demonstrates a due process violation. And this court in Perez-Laster observed that where, as here, we have a – faulty translation services that violate an applicant's due process right, we – that we can't expect the applicant to put on a record that doesn't exist. We obviously don't know what his actual testimony was. We have no record of it. All we do have is a transcript that shows that the applicant, as translated, did not make sense and thus couldn't put on his case. This court has thus repeatedly held that in these circumstances, prejudice is presumed as long as the applicant can show a plausible case for relief if he was given a full and fair hearing. But what is his plausible case for relief? Sure. So I'll start with the Y.L. presumption, and then I'll move on to the harm. As – in the Y.L. presumption, we have no reliable evidence in this record that would preclude him from establishing any of the six factors. And we also – if we look at the parts of the record that aren't tainted by the due process violation, it looks like the evidence underlying his conviction was very thin. It's undisputed that the police found no drugs on Mr. Madrigal's person. It's also undisputed that he received six months, whereas all his co-defendants received two years, which again suggests that the police really didn't have much, much evidence on here to support their case against him. And, Your Honors, you can be certain that if the government had evidence that would have prevented him from rebutting the other five Y.L. factors, they would have submitted that instead of just relying on the court's minute order in the immigration hearing. We also have Mr. Madrigal's sworn declaration that had he been able to communicate effectively, he could have explained that there was no connection between the conviction on one hand and the 36th Street gang. He would have explained that he was simply hanging out with a friend from school named Eltree, that Eltree was not a gang member, and that Mr. Madrigal had no idea about the drugs hidden on Mr. Eltree's person. So – so I guess fundamentally, Your Honor, we need to keep in mind that Mr. Madrigal's burden at this stage is not to convince you that he's rebutted the Y.L. factors. His burden is merely to show that there is a possibility that if he was given a fair hearing, he could have done so. And that's supported by Perez-Laster, as well as by Coleman-Arvey INS. And so then turning to the harm that he might suffer if returned to Mexico, there's really good reason to think that had Mr. Madrigal been given a full and fair hearing, he could have also established a likely threat to his life or freedom if returned to Mexico. He stated in his written application that he feared he would be harmed, mistreated, and threatened by government officials in Mexico. He also stated that he feared he would be an outcast. On what basis? Well, that's exactly the point, Your Honor. He wasn't able to develop the basis for his fear. But he has to show, like, you know, he has to show us that he has a viable claim, right? That he could have – But he couldn't talk. I'm sorry. I didn't – But he couldn't talk. Right. So – But his attorney could. Well, his attorney can't testify for him. And, in fact, that – His attorney presents the evidence, though, right? Right. But his attorney – Makes the proffer. What's the proffer? In the showing of prejudice, what's the proffer that he would be subject to persecution if he were returned? Sure. So in terms of the – I'll address both points, Ray. So in terms of the counsel point, his counsel was in the courtroom and only able to communicate with his client through a malfunctioning television system and an incompetent translator. So that's part of why it was very, very difficult to elicit the relevant testimony. But as far as his proffer, Your Honor, his proffer is that he doesn't have the strong support system he has in the United States, and he can't speak the language or Mexican Sign Language. So he has no way to communicate with anyone, even the distant relatives that he does have in Mexico. And even looking at – you know, these factors here make it very, very difficult for him to support himself and his family in the United States, even where he is able to communicate. In Mexico, he – it would be even more difficult for him to find employment, communicate with society as necessary to sort of function in our system. And, Your Honor, in vetoed beholder, this Court found that when an applicant would be unable to secure employment as necessary to support himself in the foreign country because of a protected characteristic, that rose to the level of persecution and was a valid basis for finding that the applicant would suffer harm to his life or liberty if returned to the country. So – But, you know, I must say that I have not seen a case like this before, and I'm not really familiar with sign language. Is there a different sign language for every language? How does this – Sure. Great question. Absolutely. So my understanding is that sign language doesn't actually correspond directly to any language, but it's its own language itself. And there is Mexican Sign Language. There's also Spanish Sign Language. And there's American Sign Language. So, yes, it's a totally different language that he understands none of. So he would absolutely not be able to communicate if he were – Well, we have a lot of cases where there – the argument is that I am Americanized. I have been here since I was very young, and I don't speak the language. You can send me back, and it's going to be a hardship. And those cases don't get very far. Sure. I think that the – Why is this all different? Sure. I think the difference here is that he's not just saying, I don't speak Spanish. He's saying, I am disabled. I have a protected characteristic that renders me unable to support myself. And, I mean, it took him – he's 35 years old now. It took him a very long time to even gain, you know, basic competency in English or in American – you know, American Sign Language and the ability to write in English well enough to get by. So I think here the difference is you have not just a language barrier. You have a disability that compounds that language barrier significantly. And you have – and, in fact, Your Honor, and I know you mentioned that you haven't seen this fact pattern before, but we did an applicant's deaf – that disability to be – What's the cause of the case? Your Honor, I'm not sure if we cited a case or simply just pointed out that this – Well, but it's important to have a case, some case authority to support the proposition. Because if you tell us there's no case to support your proposition, the proposition is much less likely to be persuasive. Sure. How much cocaine base was involved in his state conviction? Your Honor, we don't know. And that is one of the problems with this case. There's a fundamentally incomplete record. We have no idea how much cocaine was involved. And that's one of the pieces for which a remand for further fact-finding is necessary. And was there any money exchanged at the record show? Again, absolutely no evidence that any money was exchanged at all. So again, another fact for which we need further proceedings to determine. So you're asking us to remand for further proceedings? Yes. Yes, Your Honor. That we think is the appropriate remedy here, and that's supported by – for Perez-Laster is probably the best case, but I could name others if you need. And I actually did find – it's footnote 16 on page 45 of our brief. So I guess the basis for our position that this is not unheard of is a recent report by the Asylum Office of the United States Citizenship and Immigration Services that they granted at least one asylum application. So it wasn't a case because it happened at the administrative level, exactly. As I understand it, that information that I asked you about, and others, is needed by you to rebut the presumption in the Y.L. case? I'm sorry. Would you mind – I didn't fully understand the question. Yeah. You need that information to rebut the presumption of serious – particularly serious crime in the Y.L. case. That's – that's right, Your Honor. And in as much as the applicant is given a full and fair hearing, if he fails to, you know, offer evidence necessary to support his case, then you're right. He would not be entitled to the relief. But the whole point here is that he didn't get that full and fair hearing. He didn't get that opportunity. And in fact, in Perez-Laster, this Court confronted the exact same circumstances. They confronted a situation in which the applicant had not put on evidence as to essential elements of his case, and the Court expressly rejected that as a basis for denying the requested relief here, and granted the petition notwithstanding that, explaining that there's no plausible reason why an applicant wouldn't put on essential elements of his case, except that there must have been some communication difficulty that prevented him from doing that. There's no strategic reason why he would have done that. And in fact, you can look at the record here, and you see counsel trying over and over again to elicit testimony about the, you know, circumstances surrounding this conviction and being unable to do so, just getting garbled and nonresponsive answers. And that's at Administrative Record 343 is the, you know, colloquy where you see different times, well, tell me what happened, and just not getting responsive answers. Sotomayor, I just wanted to understand the setting here a little better. He was not in the courtroom? Correct. His lawyer was in the courtroom? Lawyer was in the courtroom. And the government lawyer was in the courtroom, and the I.J. was in the courtroom? Correct. And he was appearing? He was appearing from a detention center via a screen. On a screen? Uh-huh. And he the screen was pointed at the translator. So his entire perception of these proceedings is limited to what he can see the translator doing. And I would just emphasize that when, because it's such a visual language, that it's, you know, all he can do is see what's going on. And so if there's freezing, that makes it even harder. When you're not hearing, you're only seeing. The translator was translating. I'm sorry. The translator was translating into what? American sign language. Correct. Did the freezing occur throughout the proceedings? It did. And I can give you the record sites if that would be useful. I don't want all that. I thought the government had a different view. But they do have a different view. But let me, I'll just give you a couple that were well in the proceedings. I found a couple that you that you that you cited. But I was just curious as to whether it was continuous freezing or where there were a couple of places. Because we have that sometimes, too, when we're doing remote arguments. So I was just curious. But I'm sure we'll hear from the government. You have 57 seconds left. Do you want to change? I will reserve. Thank you. We'll hear from the government. Your Honors, may it please the Court, Nancy Cantor on behalf of the Attorney General. This case has a long and circuitous history. But at bottom, there are only two issues the Court needs to decide. One, whether Petitioner received a fair opportunity to testify in support of his application for withholding of removal. And two, whether the agency identified and applied the correct standard in concluding that Petitioner failed to rebut his heavy presumption that his California health and safety conviction constituted a particularly serious crime. With regards to his testimony before the immigration judge, or the removal proceedings before the immigration judge on December 9, 2010, the government's position today is that any initial freezing of the televideo conferencing system occurred at the beginning of the hearing. The hearing begins- Excuse me. Sorry. I'm sorry to interrupt so early in your statement. But while I still have it fresh in my mind, would you please describe, first of all, do you agree with the description of how the hearing took place that was just told to us by defense counsel? And if not, or whatever, add to it as to your views as to how this transcript was- how it took place. Your Honor, the government agrees that Petitioner was located in a detention facility and that his attorney, the translator, was present in the courtroom with the immigration judge. So the translation that occurred was by videoconferencing of the Petitioner in one place and his sign language interpreter in the courtroom with the judge. Did that answer the question, sir? It's helpful. Well, you were beginning to say there's a complete dichotomy between the positions of the parties regarding the freezing, because I understand the government to say that there was some freezing initially, but the problem was corrected. However, the Petitioner's attorney says there was freezing throughout. So why is there such a discrepancy between the parties on that point? I don't know, Your Honor, to be honest. I've read the transcript of the December 9, 2010 hearing a dozen times by this point. I've tracked the page record citations, and it appears to me that from the start of the hearings, page 312 of the record, there was probably 10 or 12 pages in which there were initial issues with freezing. The immigration judge confirmed with the Petitioner whether or not he would like to continue, and he said, I would prefer to continue. The immigration judge said, let me know if you have any problems. His Petitioner's counsel then asked him questions about his eligibility for a fee waiver, which he answered completely. The immigration judge granted the fee waiver. Petitioner's testimony about his at — Petitioner's merits testimony begins at page 334, and it continues for approximately 20 pages. During that 20 pages of testimony, there's only about five lines in which an interpreter interjects and says, he can't see me, and I assume he's referring to the Petitioner. So there's five lines in which the interpreter says, he can't see me, the issue is corrected, and Petitioner was instructed that he should continue to look at the Interpreter. How many pages did the transcript include? How many pages altogether did this hearing transcript have? The Petitioner's — the hearing begins at 312, and at 354, Petitioner's testimony concludes. So we have a little over 40 pages. There are a number of times in which, yes, there is a notation that it's indiscernible, but indiscernible refers to the recording, not the recording on the tape, not to Petitioner's actual ability to communicate or speak to his translator, who is then translating to the Immigration Judge. Would that indicate a freezing? Excuse me? How do we know what indiscernible means in context of this case? I don't know, Your Honor. I mean, to be honest, I see indiscernible in transcripts all the time. It's just the tape does not record. If it's freezing, would there be a different notation? Not that I'm aware of. We would only know that there's freezing issues because the parties or the Immigration Judge raises that. But the tape itself wouldn't indicate because the tape would just be an audio recording of the proceedings. What facility was this in? Where were we? I'm not sure. We're in an immigration court. Where? I'm just curious. I've been in a — Oh, I can grab my record and — Okay. That's all right. Can I just get this indiscernible situation a little more clearer for me? I mean, could it mean several things indiscernible? I'm not sure I understand the question, Your Honor. Well, I don't know. That's the problem. I don't understand indiscernible exactly what it means. Does it mean that nothing was going on or that something was going on or was not understood or was not recorded? What are the alternatives we have here? Well, indiscernible would suggest that there was some noise that the tape recorder picked up, but that the individual transcribing the tape could not make out what that noise was. So that could be someone talking outside the door. It could be the Immigration Judge asking a question, but it could also be a cell phone going off in the corner. We simply don't know. I mean, it's an unfortunate nature. It's the unfortunate nature of these immigration proceedings that they are audio recorded, and if and when an appeal is filed, a transcript is prepared. They are not transcribed as a matter of course. Well, the problem is that I have with this is that basically you're testifying at this point. Excuse me? You're interpreting of the record before. It's almost as if you were testifying to me. No, I'm sorry, Your Honor. I'm just telling you the variety of the possibilities that it could have been. We simply don't know. It could have been testimony. It could have been outside noises. It could have been, I mean, any number of things, and I thought that was what the Honor was asking, what the possibilities it could have been. Okay. So I apologize if I misspoke. No, you didn't. I guess I'd like to briefly address the second part of the second issue before this court, which is whether or not Petitioner had the opportunity to fully and rebut the presumption that his conviction is a particular serious crime. Under matter of Y.L., it is a heavy presumption that a conviction for California Health and Safety 11351.5 is a particular serious crime, and it is Petitioner's burden to rebut that. So here, Petitioner only presented evidence that there was no gang involvement. There is no testimony about, there is no evidence regarding how large the, how much carcane there was or whether or not there was money exchange because the government did not need to present that evidence. The presumption is that it is a particularly serious crime, and it is Petitioner's obligation to, or Petitioner's burden to rebut that presumption. During the hearing, his counsel, Petitioner's counsel, was given the opportunity to follow up after the conclusion of cross-examination. The immigration judge asked whether Petitioner's counsel had any follow-ups, and he said no. That would have been a great opportunity to present any amount of evidence regarding, you know, the quantity of cocaine, whether money was paid, whether there was the threat of violence or absence of it. But there was simply no evidence to that effect. Sotomayor, would you please address the prejudice prong of the due process claim? Well, Your Honor, the government's position is that Petitioner can't meet his burden of demonstrating prejudice for two reasons. One, should the court agree that the board applied the correct legal standard, then the particularly serious crime conviction stands, and thus Petitioner is statutorily ineligible for withholding a removal. Two, the evidence Petitioner seeks to present in support of his claim for withholding simply has no nexus to a protected ground. A protected ground is one that is based on race, religion, nationality, or membership in a particular social group. A disability is not a protected ground, or at least Petitioner's disability, while regretful, is not the type of protected ground that is cognizable for withholding a removal. Ma'am, can I ask you, what is the evidence of gang activity in relation to his conviction? Well, Petitioner testified, and I believe the meat of the testimony is between on page 350-351. Petitioner was asked whether or not he was a member of a gang. He said he was not a member of a gang. He admitted that he hung around members of the gang, gang members, because he was interested. He was curious, I think he said, curious. Excuse me? Curious. Yes, he was curious. He was curious. Sorry, I misspoke. INS counsel then asked, what about the I-213 that identified you as a gang member? Petitioner said, I'm not a member. I was just hanging around. He was then asked whether any of the gang members, I believe, that he was hanging around with were involved with drugs, to which Petitioner responded, yes, they were, yes, they were. So that was the evidence that the agency relied on in concluding that, well, there was evidence of gang involvement. In relation to his conviction? Yes, I believe so, Your Honor. That was the agency. How does that go? Well, the board said there was no clear error in the immigration judge's finding to that regard. I don't understand, I still don't quite understand the evidence that connects him to gang activity at the time of his, in relation with the conviction. Well, Your Honor, if you look at the, if you're looking at the entire testimony, yes, Petitioner initially denied that he was a member of the gang or that his conviction had anything to do with his participation or hanging around with members of gangs. But during follow-up tests, during cross-examination, trial counsel, INS trial counsel, asked him questions which brought his involvement, brought to light his involvement both with gang members, his hanging around with them, and his hanging around with gang members who were involved with drugs. So the board simply determined that there was no – I'm asking you about his conviction, not his hanging around with members. Right. But that was the board reviewing for clear error, and the board said that it found no clear error in the immigration judge's determination. To the extent that this Court would be reviewing that, it would be reviewing it for an abuse of discretion, and there's simply no evidence that would compel – no, there's simply no evidence that would – at least the government's position is that it was not an abuse of discretion for the board to make that finding. Counsel, does there have to be any gang connection in order for the particularly serious crime determination to stand? There does not, Your Honor. I just – I was just curious why the discussion went into the gang membership, if that's not necessary, for the presumption of the particularly serious crime. The statute does the heavy lifting, so I don't understand why the gang finding was necessary or pursued. Well, Your Honor, that was just the immigration judge. You're absolutely correct. The presumption applies irrespective of whether or not there is gang involvement. Petitioners sought to rebut that presumption by referencing one of the six mitigating factors, and that was gang involvement. There are still other mitigating factors, and under matter of Y.L., the board clearly states that only if all the criteria are demonstrated would it be appropriate to move it away from that presumption. So the government in its brief indicates that, you know, yes, we're making a big deal about the gang involvement here, but that was really only one of the six factors that petitioners sought to rebut, and there's no evidence of any of the other mitigating factors that would have been necessary to move away from the presumption. Unless the Court has any further questions at this time, the government respectfully requests that you deny the petition for review. Judge Toriaya, do you have any other questions? No, thank you. All right. Thank you, counsel. Roboto. Your Honor, just to briefly address the point about the other Y.L. factors. This Court has held multiple times in Brazilian v. Holder and VTUG v. Holder that framing a fact-finding as an absence of fact is nonetheless a finding of fact. So in Brazilian v. Holder, this Court found the BIA had engaged in impermissible fact-finding when it found that the Brazilian had, quote, failed to establish how he would be recognized in Haiti as an Arda-type supporter because in order to reach that conclusion, the BIA had to find that Brazilian had offered no evidence about how he would be recognized. And that's exactly the same thing that the BIA did here. As to go back to the point about harm that Your Honor has raised, and I would just point you to Colmenar v. INS, and I'm quoting, Although Colmenar does not explain exactly what evidence he would have presented to support these assertions, we do not require such an explanation of fine prejudice. We required the petitioner only to show that the due process violation potentially affected the outcome of the proceedings. And that stands met here. We have Mr. Madrigal's testimony on page 342, which, though incomplete, gives some basis. He says he thinks he would be lost for the rest of his life in Mexico. He gives at least some basis for why he thinks he would suffer harm. In his written application, as I already stated, he stated he'd be an outcast, he'd be mistreated. In his brief to the BIA, he explained that he lacks basic human functionality and wouldn't be able to support himself. So that's his proffer, and had he been able to fully explain himself and articulate the harm that would befall him, there's a very good chance that he would have been able to show it. Counsel, the problem is the nexus to a protected group. Sure. Your Honor, I would say his disability is the nexus. But you weren't able to point us to a case where we said that disability is a protected status for purposes of immigration. Sure. This is a case of first impression on that specific point. But, vi tic vi holder, this Court held that homosexuality, you know, is a protected group. It's not a disability. Homosexuality is not a disability. Right. If anything, I would say a disability is even more of a protected characteristic. We'll see. All right. Thank you. Thank you to both counsel. We particularly thank counsel for taking this case pro bono. The case just argued is submitted for decision by the Court. The final case on calendar is Admiral Insurance Company versus Community Insurance Group.
judges: Torruella, Schroeder, Rawlinson